**CASE NO. CIV-06-307-RAW**

---

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

---

**JOSHUA BELLEW,**

**Plaintiff,**

**vs.**

**NORTHEASTERN STATE UNIVERSITY**
**ex rel., STATE OF OKLAHOMA,**

**Defendant.**

---

**DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT & BRIEF IN SUPPORT**

---

**KEVIN L. McCLURE, OBA #12767**
**Assistant Attorney General**
**Oklahoma Attorney General's Office**
**Litigation Section**
**313 N.E. 21st Street**
**Oklahoma City, Oklahoma  73105**
**Tele: (405) 521-4274   Fax: (405) 521-4518**
**Kevin_McClure@oag.state.ok.us**

**Attorney for Defendant**

February 9, 2007

## TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iii-v**

**DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT & BRIEF IN SUPPORT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**UNDISPUTED MATERIAL FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**ARGUMENT & AUTHORITY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

    **PROPOSITION I.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

    **DEFENDANT SHOULD BE GRANTED
    SUMMARY JUDGMENT ON PLAINTIFF'S
    TITLE VII - GENDER DISCRIMINATION AND
    SEXUAL HOSTILE WORK ENVIRONMENT
    CLAIMS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

        **Title VII - Gender Discrimination Claims.** . . . . . . . . . . . . . . . . . . . . . . . . . **13**

            **1.**     *Defendant discriminates against the majority/*
                      *"but-for"* **Plaintiff status.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

            **2.**     *Plaintiff performed his job satisfactorily.* . . . . . . . . . . . . . . . . . **15**

            **3.**     *Plaintiff suffered an adverse employment action.* . . . . . . . . . . . **15**

            **4.**     *His employer treated similarly-situated employees*
                      *(i.e., females) outside his protected class more*
                      *Favorably than he was treated.* . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

        **Title VII - Sexual Hostile Work Environment Claim.** . . . . . . . . . . . . . . . . **18**

    **PROPOSITION II.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

    **DEFENDANT SHOULD BE GRANTED SUMMARY
    JUDGMENT ON PLAINTIFF'S COUNT II -
    RETALIATION CLAIM.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

            **1.**     *Protected activity in opposition to discrimination.* . . . . . . . . . . . **22**

i

        **2.**      *That a reasonable employee would have found the*
                    *The challenged action materially adverse.* . . . . . . . . . . . . . . . . . . . . . . . . **22**

        **3.**      *Causal connection.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

**PROPOSITION III.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**THIS COURT SHOULD GRANT DEFENDANT**
**SUMMARY JUDGMENT ON PLAINTIFF'S**
**STATE CLAIM OF BREACH OF THE COVENANT**
**OF GOOD FAITH & FAIR DEALING CAUSE OF**
**ACTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**CERTIFICATE OF SERVICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

# TABLE OF AUTHORITIES

## Federal Cases

*Anderson v. Coors Brewing Co.*,
181 F.3d 1171 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Annett v. Univ. of Kan.*,
371 F.3d 1233 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 22

*Argo v. Blue Cross and Blue Shield of Kansas, Inc.*,
452 F.3d 1193 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742, 118 S.Ct. 2257 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 19

*Burlington N. & Santa Fe Ry. Co. v. White*,
126 S. Ct. 2405 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Burrus v. United Tel. Co. of Kansas, Inc.*,
683 F.2d 339 (10th Cir.1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Childress v. City of Richmond*,
907 F. Supp. 934 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998)
(en banc), cert. denied, 118 S.Ct. 2322 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Combs v. Plantation Patterns*,
106 F.3d 1519 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Duran v. Flagstar Corp.*,
17 F. Supp. 2d 1195 (D. Colo. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Elrod v. Sears, Roebuck & Co.*,
939 F.2d 1466 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Faragher v. City of Boca Raton*,
524 U.S. 775, 118 S.Ct. (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 19, 20

*Flannery v. Trans World Airlines, Inc.*,
160 F.3d 425 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Gunnell v. Utah Valley State Coll.*,
152 F.3d 1253 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

iii

*Manning v. Metro. Life Ins. Co.*,
127 F.3d 686 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **15**

*McCue v. State of Kansas, Dep't of Human  Resources*,
165 F.3d 784 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **21**

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). . . . . . . . . . . . . . . . . . . . . . . . . .  **13**

*Nix v. WLCY Radio/Rahall Communications*,
738 F.2d 1181 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **18, 24**

*Notari v. Denver Water Department*,
971 F.2d 585 (10th Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **13, 18, 19**

*Noviello v. City of Boston*,
398 F.3d 76 (1st Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **16**

*O'Neal v. Ferguson Constr. Co.*,
237 F.3d 1248 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **22**

*Oncale v. Sundowner Offshore Servs., Inc.*,
118 S. Ct. 998 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **20**

*Perry v. Woodward*,
199 F.3d 1126 (10th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **13**

*Phillips v. Taco Bell Corp.*,
156 F.3d 884 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **20**

*Shepard v. Comptroller of Pub. Accounts of Texas*,
168 F.3d 871 (5th Cir. 1999) modified. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **19**

*Smart v. Ball State Univ.*,
89 F.3d 437 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **15**

*Stover v. Martinez*,
382 F.3d 1064 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **16, 21**

*Wells v. Colo. Dep't of Transp.*,
325 F.3d 1205 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **15**

## State Cases

*Bone v. State of New Mexico*,
2006 WL. 1966651, C.A. 10 (N.M.), July 14, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Burk v. K-Mart Corp.*,
1989 OK 22, 770 P.2d 24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Federal Statutes

42 U.S.C. § 2000e-3(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## IN THE UNITED STATE DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

JOSHUA BELLEW,     )
            )
      Plaintiff,  )
            )
vs.           )  **Case No. CIV-06-307-RAW**
            )
NORTHEASTERN STATE UNIVERSITY )
ex rel, STATE OF OKLAHOMA,  )
            )
      Defendant.  )

## DEFENDANT'S MOTION FOR SUMMARY
## JUDGMENT & BRIEF IN SUPPORT

COMES NOW, the Defendant, Northeastern State University, ex rel., State of Oklahoma, to file this Motion for Summary Judgment.  In support of this Motion for Summary Judgment, Defendant would show this Court the following:

### UNDISPUTED MATERIAL FACTS

1.  The Plaintiff, Josh Bellew, was first hired as a resident assistant for the Housing Department of the Defendant, Northeastern State University ("NSU") in either 2001 or 2002.  (See Exhibit No. 2, pg. 11, lines 16-25).

2.  All resident assistants and hall managers are hired as "employees at-will" for one year terms.  (See Exhibit No. 3- Affidavit of John Wichser; see also, Exhibit No. 6, last para.).

3.  Bellew served as a resident assistant for about one and one-half years, with Rex Brown (a hall manager) as his supervisor.  (See Exhibit No. 2, pg. 12, ln. 24-25, pg. 13, ln, 1-8).

4.  In June of 2003, long time Assistant Director of Housing, Laura Fruge died, leaving a void in the Housing Department.  (Exhibit No. 3 - Affidavit of John Wichser).

5.     Ken Caughman, the Director of Housing for the University, hired Sharla Winrich to take Ms. Fruge's place on June 17, 2003.  (Exhibit No. 3 & Exhibit No. 19, pg. 56-57 - Caughman ad hoc testimony).

6.     Winrich immediately started changing things, by discussing a new dress code with Ken Caughman and Barbara McBrayer in the fall and spring of 2004.  (Exhibit No. 19, pg.58 and 59).

7.     Bellew was hostile to his new supervisor, Ms. Winrich, from the very beginning, because she had criticized his clothing in October of 2003, and he finally voiced his anger of Winrich's management style in a letter he gave to her in February of 2004, after attending a Housing Conference in Texas.  (Exhibit No. 19, bottom of pg. 5 where Josh is discussing his last evaluation in October of 2003 & pg. 6 where he says Winrich criticized him for showing up at the evaluation not dressed up; see also Bellew's February 2004 letter to Sharla Winrich - Exhibit No. 4).

8.     Bellew also discussed his anger with Ms. Winrich's management style to Director of Housing Ken Caughman shortly after he sent Winrich the February 2004 letter, and Caughman told Bellew his letter was very inappropriate, and that he should not criticize his new supervisor's management style.   (Exhibit No. 19, pg. 6, last paragraph; pg. 7, para. 1; pgs. 55 and 56 - Caughman's comments).

9.     Bellew says that from the time he sent that February 2004 letter to Winrich until the filing of his grievance on June 21, 2004, Winrich was always threatening his job because he had a bad attitude.  (Exhibit No. 19, pg. 4, para. 7, last 6 sentences).

10.     On June 21, 2004, Bellew filed a grievance with Tere Feller, the temporary Assistant Director of Human Resources for the University.  (Exhibit No. 5).

2

11.     In that complaint, Bellew claimed for the first time that Winrich, his new supervisor, had touched him "affectionately" or "semi-sexually".  (Exhibit No. 5).

12.     In that first complaint Bellew described the touching as "rubs shoulder, back, & arms lightly".  (Exhibit No. 5).

13.     In his Deposition, Bellew further elaborates by stating that:

a.      the touchings were "arm rubs", "shoulder rubs", and "hugs" (Exhibit No. 2, pg. 23, ln. 24-25, pg. 24, ln. 1-4);

b.      at no time did she ever touch his genitalia or request sexual relations (Exhibit No. 2, pg. 24, ln. 10-15);

c.      he describes the arm rubs as up and down his arm from roughly his shoulder to his elbow, one or two times, then he would pull away (Exhibit No. 2, pg. 24, ln. 16-21; pg.25, ln. 2-11);

d.      he describes the shoulder rubs as occurring when he was sitting and she would come up behind him and rub his shoulders and back, lasting just "three or four seconds" before he would "get away" (Exhibit No. 2, pg. 24, ln. 24-25, pg. 25, ln. 1; pg. 25, ln. 12-15);

e.      he describes the hugs as lasting two or three seconds and were inappropriate because she was his supervisor and she would hug him "like family" (Exhibit No. 2, pg. 25, ln. 16-24);

f.      there was never any touching of his buttocks or playing with his hair or kissing (Exhibit No. 2, pg. 26, ln. 1-11);

3

g.      he believes that Ms. Winrich viewed the arm rubs, shoulder rubs, and hugs as what one family member would do to another family member (Exhibit No. 2, pg. 30, ln. 24-25; pg. 31, ln. 1);

14.     Bellew states in his deposition that even though some of the so-called touchings occurred prior to the February 2004 conference in Texas, he cannot give specific incidents or dates (Exhibit No. 2, pg. 26, ln. 12-15; **but see**, Exhibit No. 19, pg. 7, para. 6 "*The touchings consist mostly ... it started pretty much February, Marchish.*").

15.     Bellew also described one incident while at the conference in Texas in February 2004, where Winrich supposedly rubbed his arm while eating in a restaurant in front of other staff members.  (Exhibit No. 2, pg. 26, ln. 16-25).

16.     Even though Bellew claims these alleged touchings occurred prior to and at the February 2004 conference in Texas, he never complained to anyone about Sharla's behavior until he filed his grievance with Tere Feller on June 21, 2004.  (Exhibit No. 5).

17.     Bellew's letter he gave to Winrich right after the February 2004 Texas conference does not mention any inappropriate touching, only that he disliked her checking up on him and making sure he was attending all of the scheduled events, and that he did not like her "family" style approach of managing the staff.  (Exhibit No. 4).

18.     Bellew claims that he filed the sexual harassment grievance because of an incident in late May or early June of 2004, when Winrich came into LaRhonda McBrayer's office where he was sitting and rubbed his back.  (Exhibit No. 2, pg. 38, ln. 4-25, pg. 39, ln. 1-25).

4

19.     From June 2004 until Bellew's discharge from NSU, Winrich never touched him again, and he rarely saw her anymore.  (Exhibit No. 2, pg. 48, ln. 24-25; pg. 49, ln. 1-25; pg. 155, ln. 20-24).

20.     In his Deposition, Bellew also describes an incident at a conference in Tulsa where Winrich had taken all of the hall managers.  (Exhibit No. 2, pg. 50, ln. 14-17).

21.     At first Bellew claims that the Tulsa conference incident occurred after June 30, 2004 (after he filed his grievance with Tere Feller), but later recants that date and states that it was actually in May of 2004.  (Exhibit No. 2, pg. 123, ln. 16-25; pg. 124, ln. 1-4; Exhibit No. 19, pg. 9, para. 11).

22.     The Tulsa Conference incident was on May 21, 2004 at a John Maxwell (Christian) Conference in a "big auditorium" and was intended for "leadership building."  (Exhibit No. 19 - RB (Rex Brown) testimony to Ad hoc committee, pg. 32, para. 4; Exhibit No. 19, pg. 9, para. 11).

23.     Bellew described the incident to the ad hoc committee in October of 2004, as Winrich moving to the seat next to him where she "touch and rubbed, caressed [his] thigh."  (Exhibit No. 19, pg. 9, para. 11).

24.     In his deposition, Bellew elaborates by stating that she rubbed his right thigh with her left hand (Exhibit No. 2, pg. 51, ln. 12-25), and that the rub was from three or four inches above his knee to about three or four inches from his genitalia.  (Exhibit No. 2, pg. 52, ln. 1-25).

25.     But Bellew's fellow hall manager and close friend, Rex Brown, who witnessed the incident describes it as merely a "pat on his thigh" (Exhibit No. 19, pg. 32, last paragraph), not intended to excite Bellew at all.  (Exhibit No. 19, pg. 34, para. 8).

26.     Bellew also contradicted his version of the facts when he testified in the NSU Ad hoc committee hearing where he says that it was **her right** hand on **his left** thigh.  (Exhibit No. 19, pg. 10, para. 4).

27.     Further doubt as to the true facts as Bellew views them can be found in comparing his EEOC Charge with his deposition testimony. (Compare - Exhibit No. 20 -EEOC Charge, where he claims she sat in his lap; with Exhibit No. 2 -Deposition, pg. 148, ln. 1-8, where he says she was not actually sitting in his lap, but rather because Winrich is such a large woman part of her was in his lap; and Exhibit No. 19 - ad hoc hearing, pgs. 9 & 10, where he never claims she sat in his lap).

28.     Bellew was (in truth) just upset with having to attend the Conference in Tulsa altogether, because he felt Winrich was trying to "trick [him] into going to church" (Exhibit No. 19, pg. 10, para. 9), and that she "was maybe pushing her faith on [him]."  (Exhibit No. 19, pg. 10, para. 11).

29.     Even though Bellew claims "gender" discrimination and "retaliation" for opposing or filing a Title VII claim in his Complaint (See Exhibit No. 1 - Complaint), his only factual basis for those claims surround Winrich's alleged actions in enforcing a dress code only against him. (Exhibit No. 2, Depo., pg. 57, ln. 1-25).

30.     Bellew claims that the dress code targeted males only and in particular him.  (Exhibit No. 2, pg. 61, 62, 63 - lines 7-14; Exhibit No. 19, pg. 12 & 13- ad hoc).

31.     But Bellew did not oppose or file any Title VII grievance until June 21, 2004 (Exhibit No. 5) and he had been previously verbally reprimanded for his improper attire in October of 2003 (Exhibit No. 19, pgs. 5 and 6).  ( "Yes and she criticized me because I didn't show up dressed up for the evaluation, before any Title VII grievance.)

6

32.     Both Caughman and McBrayer stated Ms. Winrich was attempting to implement a dress code prior to Bellew filing his grievance.  (See Exhibit No. 19 pg. 48 - LaRhonda McBrayer and pg. 59 - Ken Caughman; Exhibit No. 2, pg. 67, lns. 16-22).

33.     Winrich did not just enforce the dress code on Bellew only, she also reprimanded Rex Brown for his improper clothing as well.  (See Exhibit No. 19, pg. 37, last paragraph).

34.     Winrich was not retaliating against Bellew evidenced by her offer to help him purchase new cloths that would meet the code; but Bellew refused the offer.  (Exhibit No. 2, pg. 57, ln. 19-23; see also, Exhibit No. 19, pg. 13, last paragraph *"her solution was that the University will pay for [me] to get khaki pants ... [and] button down or polo shirts."*).

35.     When questioned further in his deposition about the dress code, Bellew admits it was "gender neutral".  (Exhibit No.2, pg. 63, ln. 23-25, pg. 64, 65; See attachment (a) to Exhibit No. 3 the actual dress code).

36.     In reality, Bellew did not view it as "gender" discrimination or even "retaliation" just against him, but instead was written "to try to control two or three specific males because they were better leaders or better bosses or just had better personality" and that "[s]he was exerting power ... that she thought she had, but did not."  (Exhibit No. 2, pg. 66, ln. 9-18; showing Bellew's total lack of respect for his supervisor).

37.     Bellew's only other retaliatory facts concern Winrich's "belittling of him" in staff meetings for not being prepared and threatening his job because of his bad attitude.  (See Exhibit No. 2, pg. 67, ln. 23-25, pg. 68, 1-25, pg. 69-75).

38.     Throughout the entire time that Bellew was employed by NSU after he gave Winrich the February 2004 letter (Exhibit No. 4), his job duties and the terms of his employment were  never

7

changed, and he was never given more (or less) job responsibilities.  (Exhibit No. 2, pg. 31, ln. 12-23).

39.     On January 8, 2007, this District Court issued an Order dismissing most of Plaintiff's state law claims.  (Exhibit No. 7).

40.     In a footnote, the Court held, "Contrary to a statement in defendant's motion, the Court does not read Count Three as alleging a wrongful discharge claim in violation of Title VII. Plaintiff will need to file an amended complaint if he wishes to assert a federal wrongful discharge claim."  (Exhibit No. 7, pg. 2, fn. 1).

41.     Even though no motion to amend has been filed by Plaintiff, Bellew claimed in his deposition that retaliatory discharge for filing an EEOC Charge was part of his lawsuit.  (Exhibit No. 2, pg. 75, ln. 24-25; pg. 76-103).

42.     Bellew claims that because NSU received the EEOC charge on January 14th, 2005 and he was then terminated that same day, that proves retaliatory discharge.  (Exhibit No. 2, pg. 157, ln. 8-25; pg. 158-159).  But the actual sequence of events was actually quit different as illustrated from the following Exhibits:

a.     Exhibit No. 5 - Bellew filed his grievance on **June 21, 2004** with Tere Feller Assistant Director for NSU Human Resources.

b.     Exhibit No. 6 - Bellew is told **July 1, 2004**, that he was hired as a Hall Manager for the next year, i.e., July 1, 2004 to June 30, 2005. (Note - it also confirms his "employee-at-will" status).

c.      Exhibit No. 8 - **July 6, 2004**, Assistant Director of Human Resources, Tere Feller informs Bellew that she has determine there is insufficient evidence to confirm that sexual harassment had occurred.

d.      Exhibit No. 9- **July 14, 2004**, Bellew sends Feller a letter requesting the status of the investigation. (The cover sheet indicates he had just received Feller's July 6 letter).

e.      Exhibit No. 10 - **July 15, 2004**, Bellew requests a formal hearing on his sexual harassment grievance.

f.      Exhibit No. 11 - **August 31, 2004**, Barbara Abrocrombie (the new Assistant Director of Human Resources for NSU) sends Bellew her findings of no sexual harassment and a proposed resolution.

g.      Exhibit No. 12 - **September 8, 2004**, Bellew sends a letter to NSU's Affirmative Action Officer titled "Second request for a formal hearing".

h.      Exhibit No. 13 - **September 8, 2004**, Assistant Director of Human Resources, Barbara Abrocrombie, sends Bellew a letter informing him that his request for an ad hoc committee hearing will be granted.

i.      Exhibit No. 14 - **September 21, 2004**, Vice-President for Administration, Kim Cherry, sends Bellew a letter approving his request for an ad hoc committee hearing.

j.      Exhibit No. 15 - **October 2, 2004**, Bellew sends a letter to Vice-President Kim Cherry, expressing his disapproval of Tim Foutch sitting as the Chair of the Ad hoc committee. (Attached to that letter was a memo from Wayne Welch, Bellew's

9

non-lawyer representative for his ad hoc hearing; Bellew describes Welch as someone who has had a similar experience. Exhibit No. 2, pg. 133, ln. 2).

k.      Exhibit No. 16 - **October 4, 2004**, Vice-President Cherry's letter to Bellew assuring him that Foutch will be impartial and that his appointment was per all guidelines and NSU policy.

l.      Exhibit No. 17 - **October 18, 2004**, Bellew's reluctant acceptance of Foutch as the Chair of the Ad hoc committee.

m.      Exhibit No. 18 - **October 18, 2004**, Vice-President Cherry's letter to Bellew confirming that he has agreed to continue with the hearing process despite Foutch serving as the Chair.

n.      Exhibit No. 19 - **October 26, 2004** and **November 5, 2004**, the transcript of the Ad hoc committee hearing. (Note the scriveners error on the top of page 30, stating a date of October 5, 2004, it should be November 5, 2004).

o.      Exhibit No. 20 - **November 17, 2004**, Bellew files a Discrimination Charge against the University with both the Oklahoma Human Rights Commission and the EEOC.(Note - the duel filing numbers in the upper right corner).

p.      Exhibit No. 21 - **December 2, 2004**, letter from Tim Foutch to Vice-President Cherry informing her of the Ad hoc committee's findings of no sexual harassment, but also informing her of corrective actions that the University should be taking to resolve any of Bellew's concerns.

q.      Exhibit No. 22 - **December 9, 2004**, letter from Vice-President Cherry to Bellew informing him of the Ad hoc committee's decision.

10

r.      Exhibit No. 23- **December 12, 2004**, Bellew's letter to President Williams requesting an appeal of the Ad hoc committee's findings.

s.      Exhibit No. 24 - **December 16, 2004**, Housing Director Wichser's Letter to Bellew offering to move him to a different position with the same or similar responsibilities but without any supervision from Sharla.

t.      Exhibit No. 25 - **December 22, 2004**, President Williams' letter to Bellew informing him that he was in receipt of his request for an appeal of the Ad hoc committee decision and that he would review everything and get back with him.

u.      Exhibit No. 26 - **January 3, 2005**, Bellew's acceptance of Wisher's offer to move him to a new position. (Note - Bellew was suppose to accept or deny the new position by December 22, 2004, but it was actually signed by Bellew and accepted by NSU on 1-3-05).

v.      Exhibit No. 27 - **January 6, 2005**, Bellew rescinds his previous acceptance of the new position citing what he perceived as inconsistences in the offer. (Bellew's notes were on a post-it note and attached to the original acceptance letter as indicated on this Exhibit).

w.      Exhibit No. 28 - **January 6, 2005**, Bellew states in a letter to Wichser that since he is no longer accepting the new position he would like someone he knows promoted to assistant hall manager.

x.      Exhibit No. 3(b) - **January 7, 2005**, Memo to the File by Wichser, wherein he recites Bellew's concerns about the new position and his telling him that the

11

original offer is still the same, but for accounting reasons, only certain titles or job descriptions would be changed.

y.     Exhibit No. 29 - **January 10, 2005**, Bellew's letter to Wichser informing him that he is (once again) "reluctantly accepting" the new position.

z.     Exhibit No. 30 - **January 11, 2005**, President Williams letter to Bellew informing him that after a review of the ad hoc committee's findings, he was denying his request to rule differently.

aa.    Exhibit No. 31 - **January 11, 2005**, the revised Job Position of the University Housing is drafted, spelling out in detail what Bellew's new position would include.

bb.    Exhibit No. 3(c) - **January 11, 2005**, a email to Arlan Hanson from Wichser explaining what had occurred on January 10. Specifically, that Bellew changed his mind and was again accepting the new position and that he had thrown the acceptance letter at him. But that at 2:00 pm that same day Bellew left him a voicemail stating that his accept was (once again) "null and void" because he demanded Winrich be moved to a new position and that he was not going to move to a new position.

cc.    Exhibit No. 32 - **January 14, 2005**, Termination Letter to Bellew from Wichser for insubordination.

12

## ARGUMENT & AUTHORITY

## PROPOSITION I

### DEFENDANT SHOULD BE GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII - GENDER DISCRIMINATION AND SEXUAL HOSTILE WORK ENVIRONMENT CLAIMS

### Title VII - Gender Discrimination Claims

Generally in a ***gender*** discrimination case, a Plaintiff must establish the elements of a *prima facie* case as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Those elements are: (1) **Plaintiff belongs to a *protected class***; (2) Plaintiff performed his job satisfactory; (3) Plaintiff suffered an adverse employment action that affected a term, condition, or privilege of his employment; and (4) Plaintiff's employer treated similarly-situated employees (i.e., females) outside his protected class more favorably than he was treated. *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999). However, because Plaintiff does not belong to a "protected class" under the 14th Amendment (e.g., female, or a minority race, religion, or national origin group), the Tenth Circuit requires an additional showing pursuant to *Notari v. Denver Water Department*, 971 F.2d 585, 589 (10th Cir.1992) for claims of ***reverse discrimination***. To establish a prima facie case under *Notari,* instead of proving element number 1 (member of a "protected group") a Plaintiff is required instead to "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority," or to present "indirect evidence sufficient to support a reasonable probability, that but for [his] status the challenged employment decision would have favored [him]." *Notari,* 971 F.2d at 589-90. See also, *Bone v. State of New Mexico*, 2006 WL 1966651, C.A.10 (N.M.), July 14, 2006.

13

If Plaintiff can meet his initial burden of proof for his ***McDonnell Douglas*** *prima facie* case, then the burden shifts to the Defendant to prove that there exists a "legitimate reason" for taking the action it took that Plaintiff claims was an adverse employment action. *Id.* If Defendant can prove that there exists a legitimate non-discriminatory reason for its actions, then the burden shifts back to the Plaintiff to prove that their employer's stated reason for the adverse employment action was actually "pre-textual" or false. *Id.* Plaintiff can only survive Summary Judgment under this ***McDonnell Douglas*** standard if he can bring forth evidence to prove that Defendant's stated reasons for the adverse employment action was actually a "pretext" to a discriminatory rationale. *Id.*

      1.      ***Defendant discriminates against the majority/"but-for" plaintiff's status***

Defendant, NSU, is a "Equal Opportunity Employer". (see Affidavit Exhibit No. 3, para. 9, and its attachment (d)). All employees (by policy) are to be treated equally, regardless of "race, gender, national origin or religion." (See policy). Plaintiff cannot produce one stitch of evidence to prove Defendant is "one of those unusual employers who discriminates against the majority." *Notari*. Likewise, Plaintiff cannot produce "indirect evidence sufficient to support a reasonable probability, that but for Plaintiff's status [male] the challenged employment decision would have favored him." *Notari*. Plaintiff claims the following are his challenged employment decisions under Title VII "gender" discrimination:

      a.      A dress code policy that targeted males only; and

      b.      That the dress code was enforced only against him.

Plaintiff cannot produce one piece of evidence that "***but for***" his status as a male those decisions would have favored him. The undisputed evidence is that Winrich had previously verbally reprimanded Bellew in October of 2003 before any alleged sexual harassment or touching occurred

(Exhibit 19, pgs. 5 and 6) and that other hall managers had also been reprimanded for inappropriately dressing. (Exhibit 19, pg. 37, last paragraph). Winrich had discussed a written dress code in 2003 and 2004 with both her boss Ken Caughman (Exhibit 19, pg. 59) and her fellow supervisor, LaRhonda McBrayer. (Exhibit 19, pg. 48). Finally, Plaintiff admits that the Code was actually "gender neutral". (Exhibit 2, pg. 63, ln. 23-85; pgs. 64,65; see actual Code, Attachment (a) to Exhibit 3).

### 2.    *Plaintiff performed his job satisfactorily*

NSU had in place a gender neutral dress code. (Pl. Depo. admits gender neutral). Plaintiff claims he was singled out not because of his gender (male) but rather because of his complaints to NSU. Such are not gender related but are actually retaliation claims. (See Proposition II, Retaliation).

### 3.    *Plaintiff suffered an adverse employment action*

"While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); See *Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir. 1998) (shunning is not an adverse employment action where the plaintiff did not allege that the ostracism resulted in a reduced salary, benefits, seniority, or responsibilities); *Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 693 (8th Cir. 1997).

To constitute an adverse employment action, "the employer's conduct must be materially adverse to an employee's job status." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205,

1213 (10th Cir. 2003).  "[The 10th Circuit will]  decide whether an employment action is considered adverse on a case-by-case basis."  *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). "Although we will liberally construe the phrase adverse employment action, . . . the action must amount to `a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . causing a significant change in benefits.'"  *Id*. (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); see also *Annett v. Univ. of Kan*., 371 F.3d 1233, 1237-39 (10th Cir. 2004) (applying *Ellerth*).  "Mere inconveniences or alterations of job responsibilities do not rise to the level of an adverse employment action."  *Id*.

The Tenth Circuit has held that sufficiently severe or pervasive harassment of an employee can create an adverse employment action.  See *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264-65 (10th Cir. 1998) (recognizing that sufficiently severe co-worker hostility or retaliatory harassment may constitute an adverse employment action for purposes of a retaliation claim if management orchestrates or knowingly acquiesces in the harassment ); see also *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-88 (1998) (holding that harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment).  To be actionable, the alleged retaliatory harassment must be objectively and subjectively offensive, and "must rise to some level of substantiality."  *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005).  Courts must mull the totality of circumstances and factors, including the frequency and severity of the harassment, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance.  See *Id*. (adapting hostile-work-environment standards set forth in *Faragher*, 524 U.S. at 787, to retaliatory harassment claims).

16

Plaintiff has suffered no adverse employment action as a result of being male. He was required to dress more appropriately by his new supervisor, Winrich, but so were all the other Hall Managers. Furthermore, Winrich offered to help Bellew purchase clothes that would meet NSU's new dress code. Such could not be interpreted as discrimination against males only nor against him individually. NSU's proposed lateral move, taking Bellew out from under Winrich's supervision, was both reasonable and made in good faith. If anything, Bellew was getting the extra benefit of an apartment (instead of just a door room), new furniture, and a new computer. (Exhibit 3(b)).

**4.** ***His employer treated similarly-situated employees (i.e., females) outside his protected class more favorably than he was treated***

Plaintiff admits that the policy on its face was in fact gender neutral. And nowhere does he claim he was terminated for being male. Even if this Court believes Plaintiff has met his initial *prima facie* case under the ***McDonnell Douglas/Notari*** standard, Plaintiff cannot recover under Title VII for **gender** discrimination because Defendant had a legitimate non-discriminatory reason for terminating him (i.e., Plaintiff refused a transfer that would be lateral and equal to his position but would take him out from under Winrich's supervision).

Unless Plaintiff can bring forth evidence to prove that Defendant's stated reason for terminating him was really a "pretext" to a discriminatory reason, he cannot recover for gender discrimination under Title VII. Plaintiff cannot meet his *prima facie* case of proving that (1) NSU was "one of those unusual employers that discriminates against the majority; (2) Plaintiff performed his job satisfactory when clearly he disliked his new supervisor's "family oriented" management style, nor her always checking up on him, or her requests for more appropriate clothing; (3) Plaintiff suffered no actual adverse employment action, he does not claim he was terminated for being male

(only that he was retaliated against for filing a grievance); (4) Plaintiff admits the policy was actually gender neutral and the undisputed evidence was that it was not just enforced against him. Rex Brown was also reprimanded for his clothes. Finally, Plaintiff cannot dispute the undisputed fact that he was terminated for not wanting to transfer out from under Winrich's supervision. That is a legitimate personnel decision that Federal Courts are not allowed to question. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); see also *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (holding that "federal courts do not sit to second-guess the business judgment of employers"); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir. 1984) ("The employer may [make a decision regarding] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") Therefore, this Court should grant Defendant NSU Summary Judgment on Plaintiff's Title VII "gender discrimination" claim.

### Title VII - Sexual Hostile Work Environment Claim

Sexual harassment claims under Title VII are reviewed under the same **McDonnell Douglas** standard that *gender* discrimination claims are judged. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006). Like reverse *gender* discrimination cases, **reverse sexual harassment** claims are also judge under the heightened standard of *Notari v. Denver Water Department*, 971 F.2d 585, 589 (10th Cir. 1992). *Argo* at 1201. In order for plaintiff to prevail on his "COUNT TWO" claim for "*reverse* sexual harassment" he would have to prove (1) "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority," or to present "indirect evidence sufficient to support a reasonable probability, that but for [his] status the challenged employment decision would have favored [him]";

18

(2) the plaintiff was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) in the case of a co-worker sexual harassment, the existence of respondent superior (the employer knew or should have known of the harassment and failed to take prompt, effective remedial action.).  (See *Shepard v. Comptroller of Pub. Accounts of Texas*, 168 F.3d 871, 873 (5th Cir. 1999) modified by *Notari v. Denver Water Department*, 971 F.2d 585, 589 (10th Cir. 1992)).

The Supreme Court has enunciated the following rule for sexual harassment: if the plaintiff was sexually harassed by his or her supervisor and that harassment resulted in a ***tangible*** employment action, then the defendant/employer is liable for the harassment.  This is true regardless of the existence of a policy against sexual harassment, any remedial actions taken by the employer, the number of complaints made by the employee, and the severity of the harassment.  See *Faragher v. City of Boca Raton,* 118 S.Ct. 2275, 2292-93; *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257, 2265 (1998).  However, if: (1) the alleged harasser had the power to effect a tangible employment action but no tangible employment action was actually taken against the plaintiff ; or (2) the harasser did not have the power to effect a tangible employment action; then the sexually harassing conduct must be severe or pervasive in order to be actionable.  Factors to be considered include: the frequency of the conduct, the severity of the conduct, whether the conduct was physically threatening or humiliating, and whether it unreasonably interfered with the plaintiff's job performance.  (See, e.g., *Faragher*, 118 S.Ct. 2275; *Ellerth*, 118 S.Ct. 2257).

The Supreme Court further elaborated upon the hostile environment standard by stating that the prohibition on harassment based on sex forbids only behavior so objectively offensive as to alter

19

the conditions of the victim's employment. *Oncale v. Sundowner Offshore Servs., Inc.*, 118 S.Ct. 998 (1998). Furthermore, employers are entitled to an affirmative defense where no tangible employment action has occurred when:

(1)    the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

(2)    the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. (See *Faragher*, 118 S.Ct. at 2293; see also, *Phillips v. Taco Bell Corp.*, 156 F.3d 884 (8th Cir. 1998); *Duran v. Flagstar Corp.*, 17 F.Supp.2d 1195 (D. Colo. 1998)).

Plaintiff has alleged in this case that he was sexually harassed by his new supervisor, Sharla Winrich. But as Plaintiff readily admits, such "touchings" were really nothing more than a family type of contact. Plaintiff cannot meet element number two or three of his *prima facie* case either. Plaintiff knew, in his own mind (subjectively) that Winrich's touchings were absolutely not sexual in nature at all. Plaintiff also does not claim that he was terminated for the alleged "sexual harassment", but instead his claims (if accepted by this court) are really retaliation claims for filing a sexual harassment grievance against Ms. Winrich.

Furthermore, Plaintiff cannot meet his ***Notari*** burden, because it is without a doubt and undisputed that NSU is not one of those unusual employers that discriminates against the majority, nor can Plaintiff prove that "but for" the sexual harassment, he would have been treated differently. NSU went above and beyond the call of duty and policy to remedy Plaintiff's concerns, despite the fact that he had not suffered any real "sexual harassment."

The facts of this case fall squarely under the *Ellerth-Faragher* affirmative defense elaborated by the Supreme Court.  In this case, NSU exercised reasonable care to prevent and promptly correct any sexually harassing behavior by investigating the incident promptly and by proposing a resolution that would remedy the situation by removing Plaintiff from Winrich's supervision.   Bellew unreasonably failed to take advantage of the preventive and proposed corrective opportunities NSU had offered him by refusing to transfer to a new position.  Defendant should be granted summary judgment based on NSU's clearly established and undisputed affirmative defense.

<u>**PROPOSITION II**</u>

**DEFENDANT SHOULD BE GRANTED SUMMARY JUDGMENT
ON PLAINTIFF'S COUNT III - RETALIATION CLAIM**

Plaintiff has alleged in his Complaint under Count Three - "HARASSMENT AND RETALIATION IN VIOLATION OF TITLE VII."  Retaliation is a valid cause of action under Title VII, but the undisputed material facts in this case do not support such claim in this case.

It is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a). To prove a ***prima facie*** case of retaliation, plaintiff must show that: (1) he engaged in ***protected activity*** in opposition to discrimination; (2) that a reasonable employee would have found the challenged action ***materially adverse***; and (3) there is a ***causal connection*** between the opposition action by the Plaintiff and the adverse action.  *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004); element number two reflects a modification after *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006).  Reporting workplace discrimination to the EEOC is protected behavior.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999); *McCue v. State of Kansas, Dep't of Human*

*Resources*, 165 F.3d 784, 789 (10th Cir. 1999).  An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity.  *Annett v. University of Kansas*, 371 F.3d 1233, 1239-40 (10th Cir .2004); *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir.1982).  But "[u]nless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).

1.      *Protected activity in opposition to discrimination*

As this Court has already held in a footnote in its Order of January 8, 2007, Plaintiff has not alleged termination as an adverse employment action for opposing or filing a Title VII grievance. Even so, Plaintiff has definitely engaged in protected activity in filing his grievance and participating in the appeal and ad hoc hearing.  However, one could question his "good faith" in filing that claim. (See *Childress v. City of Richmond*, 907 F.Supp. 934, 940 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998) (en banc), cert. denied, 118 S.Ct. 2322 (1998) (The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the **plaintiff must believe** in the validity of the claim, and that **belief must be reasonable**).  Plaintiff admits he did not think Winrich's touching him was intended to be sexual and admits the dress code was actually "gender neutral."

2.      *That a reasonable employee would have found the challenged action materially adverse*

Termination would be material adverse to a reasonable employee.  But as previously discussed, this court does not read Plaintiff's retaliation claim to include retaliatory discharge.  But even if this Court does allow Plaintiff to go forward with his claim that he was terminated for filing

a "gender discrimination" claim or for filing a "sexual harassment" grievance, this court should still grant NSU Summary Judgment because a "reasonable employee" would have accepted a lateral move or job change in order to get out from under the alleged harasser's supervision.  Furthermore, a "reasonable employee" would have not (in good faith) filed a claim for "sexual harassment" or "gender discrimination" based on the undisputed facts that the supervisor's physical contact was nothing but "family in nature" and not intended as sexual in anyway.  Therefore, Plaintiff cannot meet this element of his *prima facie* case either.

   3.    *Causal connection*

   Even though Plaintiff claims in his deposition that his retaliation claim is based on his termination and the fact that he was terminated the same day that NSU received notice of his Title VII Charge, the undisputed facts just do not support such conclusion.  NSU had "notice" of Plaintiff's EEOC/Oklahoma Human Rights Charge in November of 2004.  (See Exhibit No. 20).  Plaintiff was not terminated for filing that Charge, he was terminated for not accepting a reasonable good faith offer to resolve his dispute with his supervisor by transferring him to another position of equal (if not better) status.  It is clear that from the time he filed his grievance until the time that he was terminated, he was not supervised by Winrich and rarely even saw her.  (Exhibit 2, pg. 48, ln.24-25; pg.49, ln. 1-25; pg. 155, ln. 20-24).  NSU should be granted Summary Judgment on Plaintiff's Title VII retaliation claim, because he cannot meet his *prima facie* case of retaliation.

   Even if this Court believes Plaintiff can meet his initial *prima facie* case under **McDonnell Douglas** for his retaliation case, Defendant should still be granted summary judgment because Defendant has a legitimate non-discriminatory reason for terminating Plaintiff.  Unless, Plaintiff can produce evidence to rebut Defendant's stated non-retaliatory reason for terminating him, he cannot

23

prevail on a motion for summary judgment.   That stated reason for his termination was

insubordination for physically throwing his second acceptance of the transfer offer at John Wichser

the Director of Housing for NSU, and for refusing to take the transfer and demanding that Winrich

be transferred instead of him.   *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991);

see also *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (holding that "federal

courts do not sit to second-guess the business judgment of employers"); *Nix v. WLCY Radio/Rahall

Communications*, 738 F.2d 1181 (11th Cir. 1984) ("The employer may [make a decision regarding]

an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at

all, as long as its action is not for a discriminatory reason.") Defendant should be granted summary

judgment on Plaintiff's Retaliation claim.

## PROPOSITION III

### THIS COURT SHOULD GRANT DEFENDANT SUMMARY JUDGMENT ON PLAINTIFF'S STATE CLAIM OF BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING CAUSE OF ACTION

Oklahoma does not recognize the a cause of action for "breach of the duty to deal fairly and

in good faith" in employment at will cases.   (See *Burk v. K-Mart Corp.*, 1989 OK 22, 770 P.2d 24

(wherein the Oklahoma Supreme Court expressly rejected a claim for breach of the duty to deal fairly

or in good faith with an employee at will).   It is undisputed that Plaintiff was an "employee-at-will"

and that he could be terminated at any time for any reason other than a Title VII discriminatory

reason.   The undisputed evidence in this case is that Plaintiff refused to accept a good faith effort to

resolve his dispute with his supervisor by NSU.   NSU was trying to work with Plaintiff.   Plaintiff

refused to accept the fact that he was not discriminated against or sexually harassed.   Finally,

24

Plaintiff refused NSU's transfer to a new position and that was the legitimate non-discriminatory reason for his termination.

<u>**CONCLUSION**</u>

This Court should grant Defendant NSU Summary Judgment on all of Plaintiff's remaining cause of actions.  No reasonable employee would have filed a sexual harassment grievance for mere "family nature" type touching, especially when they know such was not meant to be sexual in nature at all.  Plaintiff cannot even meet his prima facie case under ***Notari*** of proving that NSU is one of those unusual employers that discriminates against the majority for Plaintiff's Title VII "gender discrimination" and "sexual harassment" claims.  It is undisputed that Plaintiff refused a transfer by his employer.  This court is fully aware that employees do not dictate to their employer what and how their jobs will be performed.  Therefore, this Court should grant NSU Summary Judgment on all remaining cause of actions.

Respectfully submitted,

s/ Kevin L. McClure
**KEVIN L. McCLURE, OBA #12767**
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Section
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
Tele: (405) 521-4274   Fax: (405) 521-4518
Kevin_McClure@oag.state.ok.us

Attorney for Defendant

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2007, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

James J. Robertson
Richard S. Toon
Toon & Osmond, P.L.L.C.
1800 S. Baltimore, Suite 1000
Tulsa, Oklahoma  74119
*Attorneys for Plaintiff*

s/ Kevin L. McClure
Kevin L. McClure